## EDWARD E. SMITH *vs.* JAMES H. HURLEY.

### MAY 10, 1909.

PRESENT: Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1)  *Bills of Exception.    Transcript of Evidence.*

It is the duty of the Superior Court to determine, under C. P. A., § 490, whether the entire transcript of the evidence, etc., shall be filed, or how much thereof may be necessary for the determination of the exceptions; and by the allowance of a transcript as filed, the court certifies that the same is sufficient, and either party aggrieved by such allowance may bring the question before the Supreme Court under C. P. A., § 494; *and it is too late, after the expiration of the time allowed by that section, to move to dismiss a bill of exceptions because of the incompleteness of the transcript.*

(2) *Sales. Trover.*

Plaintiff purchased several lots of lumber at a public auction at which defendant was auctioneer. Plaintiff paid for all the lots but one, which he declined to accept on account of material variance from description. After the auction, defendant prevented plaintiff from removing the lots he had bought and paid for unless he would pay for the lot which he had refused to accept. Receipts for the goods purchased and orders for the removal of same were given plaintiff when he made payment for them. By the terms of sale the lots were sold for cash; were to be paid for at the time of sale, when an order of removal would be given; and purchasers were given ten days to remove goods, but they were at risk of purchaser as soon as struck off to him. No property to be removed until paid for in full, and only on presentation of order:—

*Held*, that title passed to the goods at the time of payment, the receipt being intended as a symbolic delivery.

*Held*, further, that the dispute concerning one lot did not include the other lots which had been paid for, and which plaintiff could legally remove on presentation of delivery orders.

*Held*, further, that the acts of defendant in refusing plaintiff's demand for the goods amounted, under the well-settled law of the State, to a conversion.

(3) *Principal and Agent. Trover.*

A., the receiver of the X. Co., placed B. in possession of the property. A. arranged with C., an auctioneer, to sell the property. B. was to keep possession of the property until he was presented a delivery order, from the auctioneer, showing that it had been bought and paid for. D., the purchaser of certain goods, presented an order for same to B., who refused to deliver them upon the statement of C. that the terms of sale were not complied with and the goods could not be delivered:—

*Held*, that, in preventing the removal of the goods, B. was not acting in his capacity as agent of A., but was acting for C , and his acts were in law the acts of C.

TROVER AND CONVERSION. Heard on exceptions of plaintiff, and sustained.

DUBOIS, C. J. This is an action of trespass on the case for trover and conversion, orginally brought in the District Court of the Sixth Judicial District, and from there transferred to the Superior Court on claim of jury trial.

In the Superior Court, on trial with a jury, at the conclusion of the testimony the court directed a verdict for the defendant, and the plaintiff duly excepted. Within seven days after notice of such decision the plaintiff gave notice of his intention to prosecute a bill of exceptions to this court, moved the Supe-

rior Court to fix the time within which he should file his bill of exceptions and transcript of evidence, and made request of the court stenographer for a transcript of the evidence, rulings, instructions, etc., as follows: "all evidence except that of Carpenter, Manchester and discussion of motion for nonsuit." Whereupon the following order was made by the court: "Transcript of evidence, etc., to be made and delivered by stenographer to party ordering same or his attorney of record on or before Jan. 16. A. D. 1909. Bill of exceptions and transcript of evidence, etc., to be filed in clerk's office on or before Jan. 26 A. D. 1909. Charles F. Stearns, Justice of Superior Court."

Upon the twenty-second day of January, 1909, the transcript of testimony was filed in the Superior Court, and the same, together with the plaintiff's bill of exceptions, was allowed by Charles F. Stearns, justice of the Superior Court, on the thirtieth day of January, 1909, and forthwith certified to this court.

On the sixteenth day of March, 1909, the defendant filed his motion to dismiss the plaintiff's bill of exceptions, which reads as follows:

(1)  "The defendant in the above entitled cause hereby moves that the appellant's bill of exceptions be dismissed and as ground therefor states that said bill of exceptions is based solely on alleged error on the part of the Justice of the Superior Court, who presided at the trial of said cause, in directing a verdict for the defendant, and it is not stated or shown in said bill or in the transcript of testimony which was allowed with said bill that said transcript contains all the material testimony introduced in said cause, and upon which the said Justice of the Superior Court directed a verdict for the defendant, but on the contrary it clearly appears from said transcript itself and from other portions of the record of said cause that said transcript is partial and incomplete."

The motion to dismiss must be denied. As we said in *Vester v. Rhode Island Co.*, 29 R. I. 214: "The burden of ascertaining whether the exceptions are stated clearly and separately is properly placed upon the trial justice to whose rulings the

exceptions were taken; but no exception to his allowance is permitted by the statute. The only remedy provided for either party aggrieved by the failure of the justice to act upon the bill of exceptions, or to return the same, or to his disallowance of, alteration of, or refusal to alter the same, is to establish the truth of the exceptions before this court upon petition stating the facts under C. P. A., § 494."

It is also the duty of the Superior Court to determine, under C. P. A., § 490, whether the entire transcript of the evidence, etc., shall be filed, or how much thereof may be necessary for determination of the exceptions. By his allowance of the transcript as filed, the judge has exercised his function and has certified that the same is sufficient. Either party aggrieved by such allowance may bring the question before this court under the provisions of C. P. A., § 494, hereinbefore referred to.

The bill of exceptions is founded upon an alleged error of the court in directing said verdict, and because the verdict is against the evidence and the weight thereof, and also because the verdict is contrary to the law.

The evidence discloses the fact that the plaintiff purchased certain lots of lumber, etc., at a public auction held by order of William H. Thornley, receiver of the J. C. Walsh Company, at which the defendant was the auctioneer. The plaintiff paid for all the lots so purchased, except a certain lot number "48," which was described in the prospectus furnished to the bidders at the sale as "48 Lot of kiln dried plain oak 800 to 1000 ft," which in fact contained less than 800 feet of lumber and was not all oak. The plaintiff declined to accept or pay for the same. No question is now made of the right of the plaintiff to refuse to accept the same on account of its material variance from the description in the circular. But on the day of sale, and after the auction, the defendant prevented the plaintiff from removing from the premises the lots of lumber that he had bought and paid for unless he would also pay for lot 48, which the plaintiff declined to do.

The defendant testified, in relation to his conduct in the matter, as follows: . . . "In this case we told Mr. Smith if there was a discrepancy in the amount in the catalogue and

the amount that he had measured we would make it good to him, but that he must pay for it before he took it off. There was no question but what we denied him the privilege of taking those goods until he paid for the entire lot. . . . I don't remember the exact language, but I made it plain that he was not to have those goods unless they were paid for, unless he paid for this lot that was unpaid for."

The catalogue or prospectus, hereinbefore referred to, contained the terms of sale, which included the following provisions: "Every lot will be sold for cash and must be paid for at the time of sale, when an order for removal of goods will be given. The purchaser must assume all responsibility for his purchase as soon as it is struck off to him. Purchasers will be given ten days to remove their purchases from the premises. No property to be removed until paid for in full, and only on presentation of order."

Receipts for the goods purchased and orders for the removal of the same were given to the plaintiff at the time he made payment for them. The receipts on blue paper, and delivery orders on thin white paper, were in the following form, respectively:

"Send Bill Promptly.

Address all correspondence to

"*G. L. & H. J. GROSS*

"Managers of Estates

"Providence, R. I.

"No. 5244

"Put this number on bill

"To E. E. Smith

"136 Rhodes St

"You are authorized to

"Lot 48 ............... 36.00
"69 & 70 ....... 60.00

"Rec'd pay't on account $60          3/11/08—CJM.

"Received Payment

"Mar 11 1908

"G. L. & H. J. Gross

"By                    "

"Send Bill Promptly.

"Address all correspondence to
                          "DELIVERY ORDER.
        "*G. L. & H. J. GROSS*
            "Managers of Estates

"No. 5244
"Put this number on bill
                "To E. E. Smith
                    "136 Rhodes St
"You are authorized to
        "Lot 48 .............. 36.00
            "69 & 70 ........ 60 00
                          "Received Payment
                              "Mar 11 1908
                          "G. L. & H. J. Gross
                              "By

"Estate of
    "DELIVERY ORDER"

(2)    It is clear from the terms of sale, receipts, and orders for delivery that the title to the goods was intended to pass, and did pass, at the time of payment; that the receipt was intended to be a symbolic delivery of the goods to the purchaser thereof, and that the order for delivery, which was a duplicate of the receipt whereon the words "delivery order" had been stamped, was useful as a voucher to the receiver for whom the sale was conducted.

William H. Thornley, the receiver, testified as follows: "Q. You are permanent receiver of the J. C. Walsh Company? A. I am. Q. And when were you appointed, about when? A. Some time in January, 1908. Q. Who was in charge of the property of the J. C. Walsh Company previous to that time? A. Mr. Samuel N. Grammont, who was the temporary receiver. Q. What had been his position with the J. C. Walsh Company previous to his being appointed temporary receiver? A. Bookkeeper. Q. What arrangement did you make in regard to the possession of the premises after you became receiver? A. I took possession and arranged with Mr. Gram-

mont to stay there. We ran the shop for a while under Mr. Grammont's direction, and he remained in possession and employed such assistants as he deemed advisable. Q. The business was continued for a time, was it? A. Some small jobs were finished up. The business was continued for a little while. Q. Who then had the custody of the property there from the time you became permanent receiver until after the auction sale? A. Mr. Grammont; he was there every day and was in actual possession, by my direction. Q. How long a time did he continue in possession after the auction sale? A. I believe about ten days, until the time when the deed of the real estate was given. I believe it was about ten days after the auction sale. . . . Q. What arrangement did you make with Hurley, or the firm of which he is a member? A. I arranged with him to sell the property and asked him to give me a statement as to what terms he would give me. We talked it over between us as to what he should do, and that was put in a letter to me which I accepted, which is the contract between us for the sale of the property. Q. You had a proposition from G. L. & H. J. Gross, by James H. Hurley, in regard to the sale? A. Yes; that was based upon an oral agreement and arrangement— Q. Is that the letter you refer to (indicates)? A. Yes; that is the letter.

" PROVIDENCE, R. I. January 29, 08.

'WILLIAM H. THORNLEY, ESQ.,
    'GARDNER, PIRCE & THORNLEY,
        "Providence, R. I.

'DEAR SIR:—We will sell the property of the J. C. Walsh Company on Pleasant street, in lots at public auction, on a date to be mutually agreed upon; divide the property into lots, tag them, advertise, attend to the collections, furnish delivery orders, do the work in a complete and thorough manner for a commission of 5% of the gross amount of sales.

             'Very respectfully,
                  'G. L. & H. J. Gross,
'JHH                    'By James H. Hurley.

Q. Did you accept the offer made in that letter? A. I did.
Q. And was any other arrangement ever made between you
and G. L. & H. J. Gross or Mr. Hurley, in regard to the conduct
of the auction sale, than the suggestions incorporated in that
letter? A. No arrangements at all. I kept Mr. Grammont
there and Mr. Grammont employed such assistants as he
thought proper to help him, and he was to retain possession
of the goods and only deliver them when he was presented with
a delivery order from the auctioneer that that particular prop-
erty had been bought and paid for. Q. Those were your in-
structions to Mr. Grammont? A. Those were the instructions
following this letter. Q. Then, as I understand it, you notified
Mr. Grammont that he was to recognize the delivery orders
from Mr. Hurley and deliver the goods according to those
delivery orders? A. Yes; Mr. Grammont was paid by me,
was in my employ, and the man he engaged to help him was
paid by me. . . . Q. Those delivery orders were to be
written orders, were they not? A. They would be written
orders that we could take and then use them over again for the
auctioneer as a voucher for the money that he ought to pay us.
Q. As I understand, correctly, there was no instruction given
to Mr. Grammont or anybody else to make any delivery except
upon the presentation of written orders? A. That was the
instruction that was incorporated in the terms of the sale.
C. Q. (By MR. HAHN). There was no instruction, even if
payment had been made, without a written order? A. I
didn't go over every possible circumstance that might arise.
The instructions to Mr. Grammont was to deliver goods when
the delivery order was presented. C. Q. You left those mat-
ters to be attended to by those in charge of the sale? A. I was
giving no thought to what might arise. Mr. Grammont was
instructed not to deliver up the goods until he got an order.
C. Q. Who was in charge of the auction sale? A. Mr. Hurley
was in charge of the auction itself. C. Q. No instructions
were left in the event of any disagreement between Mr. Gram-
mont or Mr. Hurley or any purchaser? A. *Only that Mr.*
*Grammont must deliver up the goods when the delivery order was*
*presented.* C. Q. But not contrary to Mr. Hurley's instruc-

tions?    A. I didn't mention Mr. Hurley, as I recall it, at all.
Mr. Grammont had my instructions, and Mr. Hurley had his
directions."

Samuel N. Grammont testified in regard to the matter in
controversy, as follows:  "Q. Now, what is your knowledge
in regard to the delivery orders for the goods involved in this
particular case, Mr. Grammont?  Were there any deliveries
given you for those?  A. There was only one delivery order
presented for any of these goods, and that was for those three
small lots in the shed.  They were presented when I was at
dinner, to my assistant.  When I returned, they were loaded
in the team.  I found the three lots loaded upon the team, and
Mr. Hurley came to me and said that his terms were not com-
plied with, and the goods could not be delivered.  Q. Whom
did he say this to?  A. He said it to me.  He said it to the
teamer, and I told him if the terms were not complied with the
goods could not be delivered, in my opinion, as I took him to
be an authority on the terms.  Q. And in consequence of what
Mr. Hurley told you, what did you do?  A. I ordered the
gates shut until the controversy could be settled.  I didn't
consider that I was a judge of the terms.  Q. What else hap-
pened immediately after that?  Go on, tell the story, so far
as you recollect what happened at the time?  A. The teamer
came in and telephoned to Mr. Smith that he could not get his
goods, and Mr. Smith came up there soon afterwards, and
what conversation he had he had it with Mr. Hurley.  He
had no conversation with me.  Mr. Hurley told him the terms
hadn't been complied with, that he must pay for all he had
bought before he could take it away.  Mr. Smith said he was
going to have the law on him if he didn't let him have them,
and he went off."

There can be no doubt but that in preventing the removal
of the goods, which had in fact been delivered and were upon
the team, and in ordering the gates shut to prevent egress
from the premises with the goods, Mr. Grammont was not
acting in his capacity as agent of the receiver, but was acting
for the defendant, and that his acts are to be treated in law
as the acts of Mr. Hurley.

The plaintiff testified, among other things, as follows, concerning the conversion: "I says, 'I come up to make a personal demand on you for this lumber.' He (James W. Hurley) says, 'I am very sorry you took me away for that.' He came out and ordered it thrown off the team that it was on. When he said he would not let me have it, I says, 'I will bring suit against you to-morrow morning for trover and conversion.' He told me to go ahead. He said he had to pay for learning once in a while."

At the conclusion of the testimony the court directed the jury to return a verdict for the defendant, and ruled as follows: "How does this case differ in its practical effects, assuming that the strongest point with you is that Hurley had possession, which I don't think is at all clear, how does this case differ from the ordinary case of contract where a quarrel arises between the parties on the terms of the contract and the vendor refuses to complete the contract according to the terms, and refuses to deliver, for various reasons that may be erroneous on his part? He says, simply, 'You have not lived up to your contract. I won't deliver.' What is the difference in the practical effect here as though Hurley has said, 'I won't make out a delivery order,' after he had taken his cash, 'simply because I don't like the color of your money,' some foolish reason, whatever it may be, how does it differ from that? Agreed that the title changes when the specific article is set apart from other articles and payment is made for that, agreed that the title passed in those lots, to Smith, agreed on that, then you have got, in addition to that, as between the vendor and vendee, the delivery of the article. Certainly that is a part of the sale as between the vendor and vendee. As between the vendee and some third party, the authorities would seem to hold that there was constructive possession, so-called, at least in the vendee, and that his possession would be sufficient to maintain an action on his part against a third party, but it seems to me you are attempting to extend the doctrine of trover to a breach of contract. It seems to me that the effect of taking the goods, the strongest you put it, that the whole effect in regard to Hurley's act was as though he had refused to issue delivery

orders. The title passed,—I think Hurley was wrong in refusing. I think those different transactions stood on their own footing, I think it was wrong in refusing to deliver the goods that had been sold in specified lots, and been paid for, on the ground that the terms of the sale had not been complied with, and I think your remedy would be more in breach of contract and trespass. I don't think it is trover. In this case I question very seriously that Hurley had legal possession. It seems to me that the best considered cases hold that on the set of facts as here, where a receiver was in charge, an officer of the court, and he appointed Grammont as his agent and had instructed Grammont directly that no goods were to be delivered from that yard without a delivery order, that Hurley was simply an auctioneer who came on premises that didn't belong to him, over which he had no control except with the consent of the receiver, and what he did there was to simply order the lots to be separated into certain portions for more convenient sale of the property, and that he assumes to say, as the servant of the receiver, that certain articles might be allowed to go out; but Grammont, the other servant of the receiver, had the right of possession from the receiver, I am inclined to think that Hurley had nothing but custody there. He didn't touch this property. True a conversion may take place with regard to bulky articles without actual touching. He simply said that, owing to what I think is right with regard to this sale, it can not be completed until you do certain things, in which he was wrong. The remedy, it seems to me, lies in another form of action.

"Mr. HAHN. The payment of these goods was made to Mr. Hurley's firm. That, it seems to me, takes it out of that rule.

"THE COURT. He had an interest,—from your own standpoint he had an interest other than intent to interfere with the title in this case. He had an interest as auctioneer, as by agreement he was held liable for the amount in the goods that went out. He was liable for the purchase price. I can't see any difference between that and the case as where he had said to them, 'I have got your money, for some reason or other I won't give you a delivery order until you comply with certain

conditions.' Allowing that, he has never touched this property. I can not find any case which has ever got to the point in which you are asking the court to give this case. It is merely a question of law. Here there is no question of the facts. It all depends on the law as given by the court. The facts are practically agreed on between them. It seems to me, as I read the authority, that there is no use for me to send this to the jury, because I simply would have to tell them it is matter of law, purely and simply. It seems to me there is no conversion here; accordingly I shall direct a verdict for the defendant, and note your exception to my ruling."

The court was in error. In the first place, the sale was one without condition other than the one requiring payment to be made before purchasers could receive delivery orders. This condition had been complied with. Under a sale without conditions, the rule is that the title passes to the bidder when the property is knocked down to him. 4 Cyc. 1048; *Lucas* v. *Wallace*, 42 Ill. App. 172; *Jenness* v. *Wendell*, 51 N. H. 63. The receipts for cash paid and the delivery orders for the goods purchased had been given to the plaintiff. Nothing remained to be done but to present the delivery orders and to take the goods away. The dispute concerning lot 48 did not include the other lots which had been bought and paid for, and for which receipts and delivery orders had also passed from the auctioneer to the plaintiff. The only thing that the plaintiff was required to do before he could legally remove, from the premises where the sale was conducted, the goods so sold and delivered to him was to present the delivery orders to Mr. Grammont, whose duty it was to receive them, and thereupon to permit the removal of the goods therein described. This permission Mr. Grammont did not withhold until the defendant instructed him to do so, and it does not appear that he would have withheld it if the defendant had not interposed his objection. There is no question of the interference; that is proved and admitted. The dispute is as to the legal effect of such interference. The defendant claims, and the court below ruled, that it amounted to a breach of contract merely, and therefore that the proof does not support the declaration for

trover and conversion. Of course it is necessary for the plaintiff to prove that the defendant converted the property belonging to the plaintiff. Conversion can be shown by the exercise of control over property, inconsistent with the right of the owner, and excluding him from the possession or depriving him of it. *Luddington* v. *Goodnow*, 168 Mass. 223; *Brintnall* v. *Smith*, 166 Mass. 253; *Edmunds* v. *Hill*, 133 Mass. 445; *Spooner* v. *Manchester*, *Ibid.* 270; *Spooner* v. *Holmes*, 102 Mass. 503. The plaintiff made a demand upon the defendant for the goods in dispute and the defendant refused to let him have them. "The very denial of goods to him that has a right to demand them," says Lord Holt in *Baldwin* v. *Cole*, 6 Mod. 212, "is an actual conversion, and not only evidence of it, as has been holden; for what is a conversion but an assuming upon one's self the property and right of disposing of another's goods, and he that takes upon himself to detain another man's goods from him without cause, takes upon himself the right of disposing of them," quoted by Durfee, C. J., in *Claflin* v. *Gurney*, 17 R. I. 187, wherein he states: "The reason why a demand is necessary where a person, who has come into possession of a chattel rightfully, continues simply to hold it, is because until he refuses to give it up there is no evidence of a conversion; and ordinarily a refusal does not precede but follows a demand. The conversion consists in the retention of the chattel under a claim of right, or in the assumption of a dominion over it in contravention of the owner's right." And see *Donahue* v. *Shippee*, 15 R. I. 453, in which this court held that an act of dominion over property equivalent to an assertion of ownership of it, and, therefore, an act necessarily inconsistent with the title of the plaintiff, is clearly a conversion, and Matteson, J., quotes with approval the following statement from 6 Bacon Abr. 677: "The action being founded upon a conjunct right of property and possession, any act of the defendant which negatives, or is inconsistent with, such right, amounts in law to a conversion. It is not necessary to a conversion that there should be a manual taking of the thing in question by the defendant. It is not necessary that it should be shown that he has applied it to his own use. Does he exercise a dominion over it in exclusion or

in defiance of the plaintiff's right? If he does, that is in law a conversion, be it for his own or another's use," and continues: "This language has been adopted in *Bristol* v. *Burt*, 7 Johns. Rep. 254; *Reynolds* v. *Shuler*, 5 Cow. 323; *Liptrot, Adm'r,* v. *Holmes*, 1 Ga. 391. In *Reid* v. *Colcock*, 1 Nott & McCord, 592, 598, the court remarks: 'Every assuming to dispose of the property of another, or the least intermeddling with it, in a manner subversive of the dominion which the owner has over it, is sufficient evidence of a conversion.'"

The question is, therefore, no longer an open one in this State. There is a preponderance of evidence to the effect that the defendant did exercise dominion over the property of the plaintiff, and did refuse the plaintiff's demand upon him for the same. Such acts amounted to a conversion of the plaintiff's property, for which an action of trover may be maintained.

The plaintiff's exceptions to the ruling of the Superior Court in directing the jury to return a verdict for the defendant are therefore sustained, and the case is remitted to the Superior Court for a new trial.

*J. Jerome Hahn and Patrick H. Mulholland,* for plaintiff.
*Gardner, Pirce & Thornley,* for defendant.
*William W. Moss,* of counsel.